16GUJARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   NICHOLAS JARECKI,

4              Plaintiff,

5         v.                          11 CV 2002(GBD)

6   MICHAEL OHOVEN, INFINITY MEDIA, INC.,

7              Defendants.

8   ------------------------------------x
                                   New York, N.Y.
9                                  June 16, 2011
                                   10:50 a.m.
10
    Before:
11
                     HON. GEORGE B. DANIELS
12
                                   District Judge
13
                          APPEARANCES
14
    RITHOLZ LEVY SANDERS
15       Attorneys for Plaintiff
    BY:  JEFF SANDERS
16       JUSTIN R. LEITNER

17

18  NIXON PEABODY LLP
         Attorneys for Defendants
19  BY:  JOSEPH J. ORTEGO
         BRIAN C. AVELLO

20

21

22

23

24

25

16GUJARC

1          (Case called)

2          THE COURT:  Mr. Ortego or Mr. Avello, let me hear you

3    first with respect to the motion.

4          MR. ORTEGO:  Your Honor, I assume that you would like

5    me to address the motion with regard to venue first?

6          THE COURT:  With regard to personal jurisdiction.

7          MR. ORTEGO:  Yes, I would.

8          I was also going to bring to the Court's attention,

9    the motion with regard to jurisdiction and there's been reply

10   papers with the preliminary injunction.  I will not address

11   that and, also, I will not address the recent request for

12   summary judgment.  I will just simply address our motions.

13         Judge, on behalf of the defendants, we respectfully

14   request that the case be dismissed for lack of subject matter

15   jurisdiction on our motion and a lack of personal jurisdiction

16   and on improper venue.  In the alternative, if the Court finds

17   that there is subject matter jurisdiction and if the Court

18   finds that there is personal jurisdiction over our clients in

19   this particular case, we respectfully request that the matter

20   be transferred to the Central District of California, the

21   federal court which we believe is the proper venue.

22         THE COURT:  Let me just put one issue aside very

23   directly.  Let me just first address the subject matter

24   jurisdiction.  If you tell me that your clients make no claim

25   that the plaintiff in this case is not the author and copyright

16GUJARC

```
1   owner and that you make a claim that you are the author and

2   share copyright ownership, then if you tell me that you

3   stipulate that they are the copyright owner, then I am willing

4   to dismiss your case and enter such an order.

5            MR. ORTEGO:  Judge, I actually anticipated that

6   question from you, and I think it would put me in a nice

7   dilemma and a box --

8            THE COURT:  That's the nature of the issue, isn't it?

9            MR. ORTEGO:  Yes, it is, Judge.  And I think at this

10  point in time, I will take the position that I cannot concede

11  or stipulate that we don't have an interest in the copyright.

12           THE COURT:  It is kind of hard for me to say there is

13  no subject matter jurisdiction.

14           MR. ORTEGO:  Well, Judge, I would think so.  Your

15  Honor is a good lawyer --

16           THE COURT:  Let's deal with that first.

17           MR. ORTEGO:  So I can save your Honor the argument

18  that Mr. Avello helped prepare for me for the subject matter

19  jurisdiction.

20           THE COURT:  Your argument was very persuasive.

21           MR. ORTEGO:  I thought so, Mr. Avello.

22           Judge, with regard to the personal jurisdiction, I

23  look at this case and I look under different ways in which the

24  Court can have personal jurisdiction in this particular case

25  over our clients and, quite frankly, I don't see it.  I look at
```

16GUJARC

1    it in a different way.  There was no purposeful action or

2    conduct conducted in this particular jurisdiction.  And I look

3    at the various different approaches in which the plaintiffs try

4    to impute jurisdiction, and I find it difficult because, first,

5    they try to have that there was a harm done within the state

6    and somehow that harm was done within the state by out-of-state

7    residents.  I find that fails.  And with regard to the contacts

8    in the state, I find that also fails.

9         This was a dispute between, I guess, folks in the

10   Hollywood movie industry.  They get involved in a particular

11   dispute.  Everything that took place with regard to this action

12   took place in California.  I even submit to the Court that the

13   plaintiff who asserts that jurisdiction is appropriate here,

14   that he may be a New York resident, but he is back in

15   California, my understanding is, as we attempt to serve him

16   with regard to the case that is pending out in California now.

17        THE COURT:  Is it your understanding -- and I can ask

18   them -- that he is both a resident of New York and a resident

19   of California?

20        MR. ORTEGO:  My understanding -- and, Judge, I am not

21   in the best position to do that -- but that he was a resident

22   of New York while the film was being filmed here in New York,

23   and from that perspective, he was and no longer is.  He may

24   have been here temporarily during that time.  And I take the

25   position that he is a resident of California that visited New

16GUJARC

1   York.

2           THE COURT:  Then let me ask it a different way.  Is it

3   your position that his domicile is California?

4           MR. ORTEGO:  It is, your Honor.

5           THE COURT:  I want to sort of figure out what

6   overlapping time period we are talking about.  I want to see

7   whether I should isolate my assessment on the pre-production

8   contacts between the parties as opposed to the film being made

9   in New York.

10          When was the film made?

11          MR. ORTEGO:  The relationship between the parties, I

12  think, would have terminated between December 2010.  The

13  production of the film and the filming of the film took place

14  subsequent to that.

15          THE COURT:  That is my understanding.  When do you say

16  the time frame was?

17          MR. ORTEGO:  Up until December 2010 would be the time

18  before the film was produced, and sometime after January 2011

19  they produced the film in New York.

20          THE COURT:  Between January --

21          MR. ORTEGO:  It was completed and now my understanding

22  is -- and I profess I am not an expert on this, your Honor --

23  but the film is now being produced, modified and having sound

24  put out in California.  They are now back out in California

25  now.

16GUJARC

1          THE COURT:  You say basically production began in

2     January?

3          MR. ORTEGO:  That's my understanding.

4          THE COURT:  And the relationship between the parties

5     basically fell apart in December, I guess, pretty much around

6     the time their L.A. counsel responded to you saying that they

7     did not intend to sign what you considered to be an oral

8     agreement?

9          MR. ORTEGO:  I think that the relationship completely

10    broke down probably in December 2010.  The letter from the

11    in-house counsel for the corporate defendant went out in March.

12    And then there is another letter from L.A. counsel that

13    subsequently came up in their reply letters when the parties

14    were negotiating back and forth, I think, and posturing.

15         THE COURT:  You say March of 2010 --

16         MR. ORTEGO:  No, March of 2011 is when the letter took

17    place, is my understanding.

18         THE COURT:  What do you say ended the relationship in

19    December of 2010?

20         MR. ORTEGO:  I think what ended the relationship was

21    the discovery of the defendants in this particular case that

22    they were out and that the person that they had as an

23    independent contractor working with them had affiliated itself

24    with the plaintiff and was going to produce the movie for the

25    plaintiff.

7

16GUJARC

1          THE COURT:  How did it end?

2          MR. ORTEGO:  I think Mr. Turen advised our clients

3    that he would no longer work for them and no longer be an

4    independent contractor for them and that he was going to work

5    directly with the plaintiffs.

6          THE COURT:  I assume subsequent to that in December

7    there were no other joint activities between the parties?

8          MR. ORTEGO:  My understanding, they had ceased at that

9    time.

10          THE COURT:  And the communication between the parties

11    was either totally or substantially between the lawyers after

12    this.

13          MR. ORTEGO:  Judge, I was not a party at that time to

14    this litigation, but my understanding and my review of the

15    files, that's what happened.

16          THE COURT:  Let me put it in context and then you can

17    continue.

18          (Fire drill alarm sounds)

19          THE COURT:  I apologize.  We have a fire drill, so we

20    are going to have to vacate the building.

21          MR. ORTEGO:  It is not indicative of my argument, I

22    hope.

23          THE COURT:  I couldn't tell you.  I didn't call the

24    fire drill.

25          Let me just check.

16GUJARC

```
 1            (Pause)
 2            THE COURT:  We are going to have to evacuate the
 3    building and come back.  I am assuming it will be about 45
 4    minutes.
 5            (Recess)
 6            (Case recalled)
 7            THE COURT:  We can continue, Mr. Ortego.
 8            MR. ORTEGO:  Your Honor, you had asked me a question
 9    before we had the fire drill break about when the parties had
10    severed relationship, so I took that opportunity, and according
11    to the declaration of the plaintiff, Mr. Jarecki, his
12    preliminary injunction declaration, paragraph 7, he indicated
13    that on or about December 5, 2010, he broke off all
14    negotiations and relationships with my clients.
15            THE COURT:  Thank you.
16            MR. ORTEGO:  Judge, at this point, with regard to
17    jurisdiction, there is no purposeful action on behalf of our
18    clients.  They felt that they are nondomiciliary here.  They
19    thought that they were dealing with a California resident at
20    all times, and so they never believed any of their actions
21    would cause jurisdiction within our great state.
22            The plaintiff alleges that there are certain e-mails
23    and phone calls.  The defendants always operated with the
24    knowledge that they believed and they thought that the
25    plaintiff lived in California where they had seen him.
```

16GUJARC

1          The e-mail address, I don't think, is any way

2     indicative of whether the e-mail address was in New York or in

3     California; it was the same e-mail address they used for him.

4          Telephone calls, they called him on a cell phone and

5     they knew at one time that he had been in New York, but they

6     had no idea they were transacting business in New York at the

7     time.

8          THE COURT:  Was there any letter correspondence

9     between the parties?

10          MR. ORTEGO:  With a New York address?

11          THE COURT:  With any address -- was there any letter

12     correspondence with any address?

13          MR. ORTEGO:  I think there was correspondence between

14     the lawyers, but other than that, I am not aware of any.

15          THE COURT:  Is there any other phone number that was

16     called or address that was identified as being the plaintiff's

17     New York address to the defendant?

18          MR. ORTEGO:  Not that I am aware of, Judge.  My

19     understanding was that there was a California lawyer that we

20     were negotiating with that was always venued in California, and

21     that address we were aware of.  We also were aware of a

22     California address, but I don't think that prior to the

23     termination there was a New York address that we were aware of

24     or ever saw.

25          THE COURT:  What about Mr. Turen's activities?

16GUJARC

```
 1              MR. ORTEGO:  Mr. Turen's activities are kind of

 2   interesting.  Mr. Turen worked for us.  Mr. Turen had some

 3   connections in New York.  We did not send him to New York to

 4   negotiate.  He went to New York on his own.  He had personal

 5   business, we found out.  And, subsequently, Mr. Turen visited

 6   the center which is referenced in their papers and when Mr.

 7   Turen got together with the plaintiffs and they made the

 8   decision to drop working with our client, the plaintiffs --

 9   which is part of our conspiracy theory -- and he said he would

10   market the picture himself without Infinity and he would do it

11   himself and they would terminate our client.

12              THE COURT:  What is the activity that Mr. Turen

13   engaged in, either on his own or on behalf of the defendant,

14   that took place in New York?

15              MR. ORTEGO:  My understanding, Judge, nothing on

16   behalf of my client.

17              THE COURT:  What about not on behalf of your client?

18   What is the activity that you are aware of that he was engaged

19   in prior to December in relationship -- my recollection is he

20   was president or chairman of the board of Infinity?

21              MR. ORTEGO:  He was an independent contractor,

22   actually.

23              THE COURT:  Somebody gave him a title.

24              MR. ORTEGO:  He did have a title, but he was an

25   independent contractor not an employee.
```

16GUJARC

|  |  |
|---|---|
| 1 | THE COURT:  What was his title? |
| 2 | MR. ORTEGO:  I think he was a former president of |
| 3 | Infinity. |
| 4 | THE COURT:  He was the president? |
| 5 | MR. ORTEGO:  He was, Judge. |
| 6 | THE COURT:  It is kind of awkward for me to get my |
| 7 | mind around how he is the president of a company at the same |
| 8 | time that he is an independent contractor. |
| 9 | MR. ORTEGO:  I agree, your Honor.  It is hard to get |
| 10 | around -- it is also kind of difficult to understand how if he |
| 11 | was the president of the company, how he would negotiate a deal |
| 12 | for himself and then resign as president. |
| 13 | THE COURT:  I have seen that happen before. |
| 14 | MR. ORTEGO:  I know you probably have, Judge. |
| 15 | THE COURT:  Either he was the president of the company |
| 16 | at the time and had authority to act as president of the |
| 17 | company or he wasn't.  If he is president of the company, it is |
| 18 | irrelevant whether he is otherwise some sort of independent |
| 19 | contractor.  He is not independent if he is the president of |
| 20 | the company. |
| 21 | MR. ORTEGO:  Judge, I can understand that distinction, |
| 22 | and I cannot necessarily disagree from the appearance of title, |
| 23 | but he certainly could not have had the authority with regard |
| 24 | to president of the company to negotiate his company -- to sell |
| 25 | out his company to start -- |

1          THE COURT:  That is not the issue.  I am not worried

2     about the part where you say he sold out.  I am trying to

3     figure out what role he had as president, what his authority

4     was as president and what ability he had to speak for the

5     company during the period of time that he was acting as

6     president on the company's behalf.

7          MR. ORTEGO:  Judge, he obviously is president.  It is

8     hard for me to argue that he could not represent the company

9     because he was doing that.  I will answer that question yes.

10          We have no knowledge that he had gone to New York on

11     two different occasions in November and December on behalf of

12     us or activities involving the company.  We had learned that he

13     had come to visit family in New York, and it turns out that he

14     had done more than that in New York.

15          THE COURT:  What is the activity that you are now

16     subsequently aware of that he was engaged in, in relationship

17     to the company when everyone was still on friendly terms?

18          MR. ORTEGO:  Our understanding was he was doing

19     nothing on behalf of the company.

20          THE COURT:  What did he come to New York for?

21          MR. ORTEGO:  Personal reasons, family.

22          THE COURT:  What did he do in New York in relationship

23     to advancing the film?

24          MR. ORTEGO:  Judge, at this point in time, I don't

25     think we learned what he was doing in New York other than

16GUJARC

1     personal activity until after this all came about.

2                THE COURT:  Is it your position that at the time that

3     he was going to New York -- as I say, the company is a fiction,

4     so I am not going to worry about what the company knew in that

5     sense -- Mr. Ohoven was unaware that he was in New York doing

6     business on behalf of Infinity in relationship to the making of

7     this film?

8                MR. ORTEGO:  Judge, before I represent that, that is

9     my understanding.

10               THE COURT:  What is the current status of your

11    contractual dispute?

12               MR. ORTEGO:  An action has been filed in the Superior

13    Court in the Central District of California in state court, and

14    there's been an action filed by the plaintiffs in state court

15    here in New York.

16               THE COURT:  It was indicated to me that there was a

17    summons with notice.  Has there been a complaint filed in the

18    case in New York at this point?

19               MR. ORTEGO:  There has, your Honor.  We have demand

20    for complaint and summons -- we got a complaint.  Our answer is

21    due, I think, June 26.  And I guess the issue before us is

22    whether we remove or not as a related matter to this Court.  We

23    have not responded yet.

24               THE COURT:  It was not clear to me what the claims

25    were in the New York State court proceeding as opposed to the

16GUJARC

1    claims here.

2              MR. ORTEGO:  As I read them, the claims are slander,

3    torts.

4              THE COURT:  Not any kind of breach of contract?  They

5    are not contractual claims?

6              MR. ORTEGO:  The plaintiff's claims, no.  In

7    California there are such claims.

8              THE COURT:  In New York, it is just slander,

9    defamation?

10             MR. ORTEGO:  Correct.  Intentional torts.

11             MR. SANDERS:  Your Honor, may I just add that there is

12   a request for a declaration that there is no contract, so the

13   contract claim is before the New York Supreme Court.

14             THE COURT:  Because I don't think that I have that

15   complaint.

16             Go ahead.

17             Finally, before I hear from them and I will let you

18   respond, particularly you can go further with regard to the

19   injunction.  Is there anything else that you wanted to address?

20             MR. ORTEGO:  Judge, I just wanted to address that with

21   regard to the venue, that California law should most likely

22   apply with regard to any contract issues -- not that this Court

23   isn't capable of applying California law.

24             THE COURT:  I don't have any contract issues.

25             MR. ORTEGO:  You don't before you, Judge, that's

16GUJARC

1    correct.

2             Judge, also with regard to exercising jurisdiction

3    over these particular defendants, I guess they would have to

4    rely on long arm jurisdiction with regard to this as well.  And

5    with regard to long arm jurisdiction, 302(a)(3) or with regard

6    to any long arm jurisdiction, you have to find some act within

7    the state or that they committed some act within the state or

8    they had contacts.  If they committed acts within the state,

9    the only tortious activity that is alleged that took place in

10   the state are these lawyer letters back and forth.  This is

11   activity that created damage within the state.  One is a

12   settlement negotiation between a California lawyer and counsel

13   in this matter.  One is in-house counsel to counsel out in

14   California.

15             THE COURT:  I don't understand that to have been

16   alleged to have committed any damage.  This is a declaratory

17   judgment action.

18             MR. ORTEGO:  It is, Judge, and I guess that I am

19   addressing the jurisdictional issue.

20             THE COURT:  I understand, but the way you just

21   characterized it, what do you understand the issue to be as to

22   what damages were caused by the letter?

23             MR. ORTEGO:  Your Honor, they argue that they need a

24   declaration for the copyright or the declaration of the

25   ownership of the film, who is entitled to the film because,

16GUJARC

1   otherwise, they will be damaged here.

2           THE COURT:  I understand that.  It is more of a

3   question for them.  That's not the analysis for jurisdiction.

4   What might happen, the analysis for jurisdiction is that they

5   committed a tortious act outside of New York and that tortious

6   act caused damage in New York.  What is your understanding as

7   to what damages had been caused in New York?

8           MR. ORTEGO:  Judge, I can't conceive of -- I don't

9   understand what damages could have been caused in New York by a

10  letter of that nature.  For example, one of the damages that

11  was alleged in New York was that Al Pacino would have been

12  involved in the film and this debate and threats by the lawyers

13  in California resulted in Al Pacino not being involved in the

14  film.

15          We submitted a declaration from the agent for Al

16  Pacino that there were no threats, that he was not concerned

17  about that, and we submitted that and they no longer raise

18  those threats.

19          Judge, I don't know what damages have occurred in the

20  state.  The movie went on.  They filmed the movie.  They are in

21  production.  They got financing for the movie.  The movie has

22  moved forward, is my understanding.  They talked about having

23  to go to this Toronto film festival, and I don't understand

24  this.  They never registered for the firm to go.  I don't see

25  any damage that has occurred.

16GUJARC

| | |
|---|---|
| 1 | THE COURT:  The correspondence that you referenced is |
| 2 | the correspondence between the California lawyers? |
| 3 | MR. ORTEGO:  Correct, both in-house and outside. |
| 4 | THE COURT:  All of the correspondence, other than the |
| 5 | litigation here in New York, all of the correspondence between |
| 6 | the lawyers was correspondence between California lawyers? |
| 7 | MR. ORTEGO:  It was, except the most recent e-mail |
| 8 | letter that came up.  There was a correspondence between, |
| 9 | settlement negotiations between counsel here and the lawyer in |
| 10 | California and that letter is referenced.  Other than that, all |
| 11 | was in California. |
| 12 | THE COURT:  Was that correspondence prior to the suit |
| 13 | being filed? |
| 14 | MR. ORTEGO:  No.  Subsequent, Judge. |
| 15 | THE COURT:  Then let me hear from the other side, and |
| 16 | I will let you respond. |
| 17 | Mr. Sanders. |
| 18 | MR. SANDERS:  Good morning, your Honor -- good |
| 19 | afternoon. |
| 20 | I want to address a few points that were raised by |
| 21 | Mr. Ortego. |
| 22 | There are numerous references in the record that |
| 23 | reflect that Infinity, Mr. Ohoven had every intention of |
| 24 | shooting a movie in New York, knew that Mr. Jarecki was living |
| 25 | both in New York and in California. |

16GUJARC

```
 1          THE COURT:  What basis do you have to assert that they
 2   knew at the time that he was living and working in New York?
 3          MR. SANDERS:  A few bases.
 4          On our reply brief annexed to Mr. Jarecki's reply
 5   declaration, there are numerous e-mails, correspondence between
 6   him, Mr. Ohoven and other parties where Mr. Ohoven, Mr. Mann
 7   freely acknowledged that Mr. Jarecki was in New York working on
 8   the movie.
 9          THE COURT:  I am not sure specifically what was in New
10   York working on the movie at the time they were doing -- the
11   instant they were doing the correspondence, or just in general?
12          MR. SANDERS:  Both.  And in fact, there's one e-mail
13   where Mr. Jarecki tells Mr. Ohoven he is in New York, he is
14   headed for JFK.
15          THE COURT:  Why does the plaintiff's presence in New
16   York have anything to do with personal jurisdiction over the
17   defendant?
18          MR. SANDERS:  If the only issue was the plaintiff's
19   presence in New York, I would agree with you.
20          THE COURT:  So that is not the determinative issue?
21          MR. SANDERS:  No.  What is determinative is, the
22   defendants reached out to the plaintiff and worked with him
23   while he was in New York in the course of setting up a movie in
24   New York.  Mr. Ohoven sent offer letters to Mr. Pacino, to
25   Susan Sarandon, to Jennifer Connelly, to Jennifer Garner saying
```

16GUJARC

```
 1   the movie will be filming in New York.

 2              THE COURT:  What difference does it make where they

 3   intended to film the movie?  That is not a basis for

 4   jurisdiction.  If you say to me you intend to try a case next

 5   week in China, it doesn't mean that you get to be served and

 6   sued in China.

 7              MR. SANDERS:  Fair enough.

 8              Let's look at Mr. Turen.  And at the point in this

 9   motion, Mr. Turen's allegations should be taken as true.  What

10   Mr. Turen writes was not in November of 2010, but in May of

11   2010, I traveled to New York and visited several potential

12   locations, I met with location owners and discussed terms on

13   which they would make their properties available for the

14   production.

15              THE COURT:  That is jurisdiction over Mr. Turen.  How

16   is that jurisdiction over Mr. Ohoven?

17              MR. SANDERS:  Mr. Turen is working for Mr. Ohoven, is

18   working for Infinity.

19              THE COURT:  That is not what that affidavit says.

20   That affidavit doesn't say, I am here on behalf of Mr. Ohoven.

21              MR. SANDERS:  It says he is here on behalf of

22   Infinity, fair enough.

23              THE COURT:  You don't say that that is a basis to

24   assert jurisdiction over Mr. Ohoven because Mr. Turen says that

25   he was in New York on behalf of Infinity?
```

16GUJARC

| 1 |          MR. SANDERS:  Infinity is wholly owned by Mr. Ohoven.

| 2 | It is the vehicle through which he is producing movies.

| 3 |          THE COURT:  Is it your position that because it is

| 4 | wholly owned by Mr. Ohoven, that the allegation simply that Mr.

| 5 | Turen is here on behalf of Infinity gives me jurisdiction over

| 6 | Mr. Ohoven?

| 7 |          MR. SANDERS:  I don't think the presence of Mr. Turen

| 8 | alone gives you the basis to find jurisdiction over Mr. Ohoven.

| 9 |          THE COURT:  Let me just isolate and then we can

| 10 | discuss those issues.  You don't claim that either Infinity or

| 11 | Mr. Ohoven was doing business in New York on any continuous

| 12 | basis where you assert --

| 13 |          MR. SANDERS:  Absolutely not.  This is about specific

| 14 | jurisdiction under 302(a)(1) and 302(a)(2).

| 15 |          THE COURT:  Your argument is that, one, because Mr.

| 16 | Turen acted in New York on their behalf --

| 17 |          MR. SANDERS:  -- as well as Mr. Salerno and

| 18 | Ms. Rosenthal.

| 19 |          THE COURT:  Salerno and Rosenthal?

| 20 |          MR. SANDERS:  That's correct.

| 21 |          THE COURT:  I will get back to them.

| 22 |          The primary argument is that Mr. Turen acted in New

| 23 | York.  Mr. Turen is their surrogate that puts them in New York.

| 24 |          MR. SANDERS:  That's correct.

| 25 |          THE COURT:  And, two, that the fact that they e-mailed

16GUJARC

```
1    and had phone conversations with your client while your client

2    was physically in New York is primarily, if not solely, your

3    basis for personal jurisdiction over Mr. Turen and Infinity?

4              MR. SANDERS:  Over Infinity and Mr. Ohoven.

5              It is Mr. Turen.  It is Mr. Salerno.  It is

6    Ms. Rosenthal.  It is efforts to access a state and city tax

7    credit program that was designed to bring foreign productions

8    into New York.

9              THE COURT:  In the abstract, I don't understand how

10   that is physical contact with New York.  What are you saying

11   they did?  Someone came to New York, went to someone's office

12   and said, give me -- I don't understand.

13             MR. SANDERS:  Sure.  Mr. Salerno and Mr. Ohoven

14   discussed the preparation of an application to the New York

15   City motion pictures.

16             THE COURT:  They discussed that in California?

17             MR. SANDERS:  Mr. Salerno never went to California --

18   Mr. Salerno did visit California, but Mr. Salerno lives in and

19   is based in New York.

20             THE COURT:  Are you saying that there is a phone

21   conversation between Mr. Salerno and Mr. Ohoven?

22             MR. SANDERS:  That's correct.

23             THE COURT:  And because Mr. Salerno is in New York and

24   Mr. Ohoven is in California, that that is a basis for

25   jurisdiction?
```

16GUJARC

1          MR. SANDERS:  Together with Mr. Turen engaging

2     Ms. Rosenthal --

3          THE COURT:  What did Ms. Rosenthal do in New York on

4     behalf of Infinity and Mr. Ohoven that is the basis of

5     jurisdiction?

6          MR. SANDERS:  She cast actors for the movie.

7          THE COURT:  She cast actors for the movie when?

8          MR. SANDERS:  In July and August of 2010.

9          THE COURT:  She cast actors for the movie by doing

10     what activity in New York?

11          MR. SANDERS:  In doing activity in New York by

12     reaching out to actors to see who was available and interested

13     and providing information -- presumably what a casting agent

14     does.  I don't have Ms. Rosenthal's declaration.

15          THE COURT:  And Ms. Rosenthal was hired by whom?

16          MR. SANDERS:  Mr. Ohoven.

17          THE COURT:  And not by your client?

18          MR. SANDERS:  That's correct.

19          And was paid by Infinity or Mr. Ohoven, we are not

20     sure whom.

21          THE COURT:  Rosenthal casted the move?

22          MR. SANDERS:  She participated in some of the casting.

23          THE COURT:  And what is the nature of that activity

24     that you say is activity that connects or holds Infinity to New

25     York?

16GUJARC

1    MR. SANDERS:  Ms. Rosenthal is a New York City based

2    casting agent.  I haven't spoken with her, so I don't know

3    specifically what she did, but what casting agents do is, they

4    reach out to actors and determine who is eligible, who is

5    available during the production period --

6    THE COURT:  So how much activity are you relying

7    upon -- a phone call, several meetings -- over what period of

8    time?  What is the significance of the activity that you say

9    warrants assertion of jurisdiction?

10   MR. SANDERS:  Ms. Rosenthal started on the movie in

11   July and stayed on through production.

12   THE COURT:  If I see you in June and I see you again

13   in September, that doesn't tell me -- you can say that you give

14   me the same sort of analysis, that doesn't give me significant

15   context.

16   You don't have any more details as to what particular

17   activity that you are relying upon that you say was happening

18   in New York, that you say is their business activity in New

19   York?

20   MR. SANDERS:  With respect to Ms. Rosenthal, they

21   engaged her.  She is in New York.  They paid her in New York --

22   engaged her for the purpose of finding actors for the movie.  I

23   think when you put that together with Mr. Turen, with the

24   multiple phone calls to Mr. Jarecki from the Infinity office --

25   THE COURT:  Mr. Jarecki doesn't have a New York

16GUJARC

1    office?

2              MR. SANDERS:  Yes, he does.

3              THE COURT:  He did not give them a New York office

4    address.

5              MR. SANDERS:  Yes, he did.  It is on the copyright

6    registration certificate.

7              THE COURT:  Because it is on the copyright

8    registration certificate doesn't mean he gave it to Ohoven and

9    Infinity.

10             Is it your position that Ohoven and Infinity knew that

11   Mr. Jarecki was a New York resident, had an office and was

12   working out of New York?

13             MR. SANDERS:  Absolutely.  The record is clear on

14   that.

15             THE COURT:  The record before me is not clear on that.

16   Where in the record does it say that?

17             MR. SANDERS:  Mr. Jarecki alleges in his opposition

18   declaration to the motion to dismiss --

19             THE COURT:  That what?

20             MR. SANDERS:  That he maintains a residence on Worth

21   Street, just blocks from this courthouse.

22             THE COURT:  I didn't even see where he claims he had

23   an office.

24             MR. SANDERS:  His law office is his home and his

25   office.

16GUJARC

```
 1              THE COURT:  So it is not a separate office?

 2              MR. SANDERS:  He maintains a 917 New York City number

 3    at all times.

 4              THE COURT:  He has a 917 number on his cell phone?

 5              MR. SANDERS:  Correct.

 6              THE COURT:  Does he have a business land line?

 7              MR. SANDERS:  Yes, he does.

 8              THE COURT:  Does he ever communicate with Mr. Ohoven

 9    or any other representative of Infinity on his New York land

10    line?

11              MR. SANDERS:  I would be surprised.  Mr. Jarecki

12    rarely uses a land line.

13              THE COURT:  So I should not assume that there is any

14    significant telephone communication with Mr. Jarecki on any New

15    York land line?

16              MR. SANDERS:  I think there is not a significant

17    communication with Nick Jarecki on any land line anywhere in

18    the world.

19              THE COURT:  You don't claim that Mr. Ohoven was ever

20    in New York?

21              MR. SANDERS:  No, we don't.

22              THE COURT:  And you don't claim that any discussions

23    or any negotiations between Mr. Ohoven and Mr. Jarecki, that

24    any of that took place in New York?

25              MR. SANDERS:  Well, it took place with Mr. Jarecki in
```

16GUJARC

New York and Mr. Ohoven in California.

THE COURT:  Mr. Ohoven was not in New York?

MR. SANDERS:  No.  Mr. Ohoven was never in New York during this period.

THE COURT:  The number of communications that you gave with regard to e-mails and the phone calls, is it your position that all of those phone calls that you referenced were phone calls when Mr. Jarecki was in New York?

MR. SANDERS:  That's correct.  On Mr. Jarecki's deposition declaration, we submitted both his phone records and his air travel records to establish that the phone calls that we isolated took place while Mr. Jarecki --

THE COURT:  You do not claim that, as to any of those particular phone calls, that Mr. Ohoven had any reason to know where Mr. Jarecki was?

MR. SANDERS:  The e-mails submitted on the reply declaration established that Mr. Ohoven did in fact know that Mr. Jarecki was in New York on many of those phone calls.  The e-mails, the air travel, the phone records -- the totality of the circumstances is clear that Mr. Ohoven knew Mr. Jarecki was in New York.  They were planning to produce a movie together in New York.  He called Mr. Jarecki, reached out to Mr. Salerno, engaged Ms. Rosenthal and sent Mr. Turen.

THE COURT:  But Mr. Ohoven was never in New York?

MR. SANDERS:  Mr. Ohoven was never in New York.

16GUJARC

1          THE COURT:  Mr. Jarecki never met with Mr. Ohoven in
2     New York?
3          MR. SANDERS:  No, he did not.
4          THE COURT:  Does Mr. Jarecki have an office in
5     California?
6          MR. SANDERS:  He also maintains a home and office in
7     California.
8          THE COURT:  When you say home and office, is that the
9     same place?
10         MR. SANDERS:  It is the same.
11         THE COURT:  He doesn't have a separate office from his
12    home?
13         MR. SANDERS:  No.
14         THE COURT:  He has a residence in California and a
15    residence in New York?
16         MR. SANDERS:  Correct?
17         THE COURT:  Where is he domiciled?
18         MR. SANDERS:  I don't know.
19         THE COURT:  Where does he vote?
20         MR. SANDERS:  I don't know.  He files taxes in both
21    New York and California.
22         THE COURT:  Do you have any authority that would say
23    that e-mails can be the basis for asserting jurisdiction?
24         MR. SANDERS:  An e-mail alone, no.
25         THE COURT:  Well, an e-mail even in conjunction with

16GUJARC

1    anything else; do you have any authority that says an e-mail

2    adds to your contacts, your jurisdiction?

3              MR. SANDERS:  I think an e-mail standing alone

4    doesn't.

5              THE COURT:  I don't know any e-mail standing alone --

6              MR. SANDERS:  E-mail, together with Mr. Ohoven's

7    knowledge that Mr. Jarecki is in New York does.

8              THE COURT:  Knowledge is not the question.  Contact is

9    the question.  It doesn't matter where he thinks he is.  It

10   matters whether or not he is taking action in New York, that

11   one would expect that if a dispute arose out of that activity,

12   that you would be hauled into New York to be sued.

13             Do you think that e-mails add to that analysis,

14   support for that position that it gives you greater contacts

15   with someone in another state than you would otherwise have if

16   you didn't have e-mails?

17             MR. SANDERS:  Yes.  I think correspondence with

18   someone or an entity that one is doing business with in another

19   state, any correspondence, whether it is e-mail, whether it is

20   physical mail, whether it is phone calls.

21             THE COURT:  What is the business that you say was

22   being done in New York at the time?

23             MR. SANDERS:  I don't understand.

24             THE COURT:  What was the business that the two of them

25   were transacting with each other in New York?

16GUJARC

1          MR. SANDERS:  They were trying to negotiate a deal to

2     put a movie together.  At the same time, they were putting that

3     movie together.  They were hiring actors.  They were hiring a

4     producer.

5          THE COURT:  I don't mean to interrupt you.  I really

6     should focus you on what I think is more critical.

7          We have two different lawsuits going on.  We have a

8     contractual dispute and we have a copyright dispute.  For you

9     to assert jurisdiction, you have to tell me how this is related

10    to the copyright.

11         MR. SANDERS:  Fair enough.

12         THE COURT:  It is irrelevant that you give me all of

13    these contacts about negotiations for a movie.  That is

14    irrelevant.  That has nothing to do with the copyright.

15         The problem I see when I try to use that analysis that

16    you want me to use -- your primary argument, if not your sole

17    argument -- I will give you two arguments, and you can see if

18    you can convince me of either.

19         One is that the nature of your claim with regard to

20    your owning the copyright, that the situs of that dispute is

21    New York.  That is your first argument.

22         Your second argument is that the defendants who

23    committed a tort, the damages of which they should have

24    expected has occurred in New York.

25         Let's deal with the less complicated part, as I see

16GUJARC

1    it.

2              What is the tort?

3              MR. SANDERS:  The tortious activity is slander on

4    title, to copyright.

5              THE COURT:  But that is not this case.

6              MR. SANDERS:  The tortious activity is taking the

7    position that they have an interest in copyright.

8              THE COURT:  That is not a tort.  That is a legal

9    dispute.  And that is related to your injunction question

10   because I looked and said, what is the injunction you want?

11             You want me to prevent them from claiming that they

12   have some interest in your copyright.  That's a legal opinion.

13   That's a dispute between the parties.  I can't muzzle them.

14   That is not appropriate for injunctive relief to say that you

15   can't claim that it is yours.  If I did that, most of the

16   people I see everyday couldn't come here.  They may have a weak

17   case, a frivolous case, a strong case, but it is not my role to

18   tell them whether or not they can or cannot claim that it

19   doesn't all belong to you -- because of the nature of the

20   negotiations between the parties and the agreements between the

21   parties, they have some interest in this film.

22             Why is that a tort for them to say, it is not just

23   yours, it is mine?  That is a legal claim.  That is not a tort.

24             MR. SANDERS:  It is a legal claim if they assert it in

25   a court of law.

16GUJARC

| | |
|---|---|
| 1 | THE COURT:  They did.  You have a case going on in |
| 2 | California in which that is what they are claiming. |
| 3 | MR. SANDERS:  They do not assert copyright |
| 4 | infringement.  They do not assert copyright ownership.  They |
| 5 | are in state court in California. |
| 6 | THE COURT:  Why is asserting copyright ownership a |
| 7 | tort? |
| 8 | MR. SANDERS:  It is a slander of title. |
| 9 | THE COURT:  Why is that a slander of title? |
| 10 | MR. SANDERS:  To say that Mr. Jarecki does not have |
| 11 | the full power and authority to license his copyright and |
| 12 | control his copyright -- |
| 13 | THE COURT:  People say that every day in numerous |
| 14 | lawsuits that I see.  That doesn't make a -- |
| 15 | MR. SANDERS:  They have not alleged that in a lawsuit. |
| 16 | THE COURT:  So you are saying -- |
| 17 | MR. SANDERS:  We are not suggesting that you enjoin |
| 18 | them from filing a lawsuit.  We welcome, and I don't think Mr. |
| 19 | Ortego would sign a complaint where Mr. Ohoven or Infinity |
| 20 | alleges copyright infringement. |
| 21 | THE COURT:  You claim their simple assertion that they |
| 22 | had an interest in this copyright, in and of itself, |
| 23 | constitutes a tort? |
| 24 | MR. SANDERS:  Correct. |
| 25 | THE COURT:  I have never seen that in a case.  Is |

16GUJARC

1   there some authority for that position?

2           MR. SANDERS:  We can certainly brief your Honor on

3   cases alleging a slander of title by taking --

4           THE COURT:  You have briefed me numerous inches so

5   far.  I assume that it is not a case that you have submitted --

6   it is not -- that you have an interest in someone else's

7   copyright, in and of itself, is a tort, if you make that legal

8   claim.

9           MR. SANDERS:  We can amend our complaint to add the

10  claim for slander and libel which we have pending --

11          THE COURT:  No, you can't because that is not the

12  basis for which you are asserting jurisdiction in this case.

13  You already have that in another case.  You cannot amend it now

14  just to try to get jurisdiction over them because you said that

15  you are properly in this court because they have committed a

16  tort and that tort has caused injury in New York and therefore

17  they should be called into a New York court.  And you

18  characterize that tort as claiming that they have an interest

19  in the copyright that they do not in fact legally have.  That's

20  the way you have characterized the tort.

21          MR. SANDERS:  In alleging that claim to third parties

22  and alleging that claim under circumstances where they knew

23  that we would have to disclose it to our bank, our distributors

24  and our --

25          THE COURT:  Even if I get past that, if they have

16GUJARC

```
 1    alleged that and I can accept the fact that that's a tort, what
 2    is the damage?
 3              MR. SANDERS:  Let's talk about the damage that has
 4    already occurred.
 5              By Mr. Mann's letter, by both Mr. Mann's conversations
 6    with Mr. Trattner, whatever Mr. Ohoven did or did not say, it
 7    was certainly clear that Mr. Ohoven and Infinity Media were
 8    claiming an interest in this copyright and, as a result, bank
 9    financing that was supposed to close early in March was
10    stalled.  Mr. Jarecki had to incur substantial additional
11    expense to explain the claim to the bank, to the bond company,
12    procure additional insurance --
13              THE COURT:  What bank is that and where is that bank
14    located?
15              MR. SANDERS:  It is Union Bank of California.
16              THE COURT:  Well, that is not New York, is it?
17              MR. SANDERS:  But the harm to Mr. Jarecki and to his
18    companies, Arbitrage PSC and Arbitrage LLC occurred in New
19    York.
20              THE COURT:  What harm occurred in New York that you
21    say caused those activities in California?
22              MR. SANDERS:  It caused the New York entities and Mr.
23    Jarecki to have to incur additional expenses that they would
24    not have had to incur.
25              THE COURT:  In California?
```

16GUJARC

1          MR. SANDERS:  No, in New York.  They wrote a check out

2    of their production office in New York --

3          THE COURT:  That standing law that because they live

4    in New York, it causes damage in New York -- that standard

5    argument that is routinely rejected.  Just because they live in

6    New York, that is not a basis for you to argue that the tort

7    caused injury to them in New York.

8          MR. SANDERS:  If the act causes Mr. Jarecki and his

9    companies to incur expense and pay that expense all over the

10   world --

11         THE COURT:  But that's not what you allege.  This is

12   declaratory judgment.  You don't allege any damage.

13         MR. SANDERS:  No.  We are not alleging damage.

14         THE COURT:  That's the problem that I have.  This is

15   your preemptive strike.  You filed this suit to avoid damages.

16   You filed this suit because you wanted declaratory judgment --

17         MR. SANDERS:  We want to stop the damages that are

18   continuing.

19         THE COURT:  What damages are continuing?

20         MR. SANDERS:  The expense that we have had to incur to

21   get through financing.

22         THE COURT:  I don't understand what that is.

23         MR. SANDERS:  The additional bank expenses.

24         THE COURT:  What is that?

25         MR. SANDERS:  The additional insurance expenses.

16GUJARC

1            THE COURT:  I am not sure what you are referring to

2     and how much you are talking about.

3            MR. SANDERS:  Several hundred thousand dollars.

4            THE COURT:  To do what?

5            MR. SANDERS:  To secure insurance policy.

6            THE COURT:  That you would not have had to have done

7     otherwise?

8            MR. SANDERS:  That's correct.  There was an enhanced

9     premium.

10            THE COURT:  That insurance is New York insurance or

11     California insurance?

12            MR. SANDERS:  It is worldwide.

13            THE COURT:  Where did you get the insurance from?

14            MR. SANDERS:  The insurance was from London, but it

15     insures a New York company.

16            THE COURT:  But it is not insurance that you got in

17     New York from a New York company?

18            MR. SANDERS:  It was placed through a New York broker

19     from a Lloyd's of London --

20            THE COURT:  Are you asserting that that is a basis for

21     New York connections because you had to get insurance from a

22     London broker, a London company here in New York?

23            MR. SANDERS:  No.  What I am asserting is that the two

24     New York companies and New York resident had to pay for and

25     secure insurance company, anywhere in the world --

16GUJARC

| | |
|---|---|
| 1 | THE COURT:  Which two New York residents? |
| 2 | MR. SANDERS:  Mr. Jarecki is a New York resident, |
| 3 | Arbitrage PSC -- |
| 4 | THE COURT:  Arbitrage PSC is not a party in this |
| 5 | litigation. |
| 6 | MR. SANDERS:  It is not a -- |
| 7 | THE COURT:  So their damage is irrelevant, isn't it? |
| 8 | MR. SANDERS:  Arbitrage PSC is a personal loan app |
| 9 | company for Mr. Jarecki. |
| 10 | THE COURT:  But it is not the plaintiff. |
| 11 | MR. SANDERS:  It is not the plaintiff. |
| 12 | THE COURT:  So the damages to them are irrelevant to |
| 13 | the analysis for personal jurisdiction. |
| 14 | MR. SANDERS:  I disagree.  I think that the damages to |
| 15 | Arbitrage PSC come out of Mr. Jarecki's pockets.  He is the |
| 16 | sole shareholder, the sole owner of Arbitrage PSC. |
| 17 | THE COURT:  No.  Unless you tell me it personally came |
| 18 | out of his pocket -- |
| 19 | MR. SANDERS:  It did, and Mr. Jarecki is an insured |
| 20 | under this policy. |
| 21 | THE COURT:  Are you saying that Mr. Jarecki incurred |
| 22 | expense personally? |
| 23 | MR. SANDERS:  Yes, he did. |
| 24 | THE COURT:  Or Arbitrage incurred that expense? |
| 25 | MR. SANDERS:  Mr. Jarecki. |

16GUJARC

1          THE COURT:  It came out of his personal funds?

2          MR. SANDERS:  Insurance expense --

3          THE COURT:  I thought you just said the opposite.  I

4    thought you just said it was the company that paid it.

5          MR. SANDERS:  The companies and Mr. Jarecki are all

6    insureds under the policy.

7          THE COURT:  Say that again.

8          MR. SANDERS:  The companies and Mr. Jarecki are all

9    insureds under the policy.

10          THE COURT:  But that doesn't matter who is insured

11    under the policy.  It matters who incurred the expense.  What

12    expense do you claim Mr. Jarecki incurred personally as a

13    plaintiff as a result of the tort that you say that they

14    committed, a claim that they had an interest in?

15          MR. SANDERS:  Sure.  He provided funds for the company

16    to write the check to the insurance company.

17          THE COURT:  What does that mean?

18          MR. SANDERS:  It means that he wrote a check from his

19    bank account.  It had to go through the production company in

20    order to get the New York State, New York City production tax

21    credits.

22          THE COURT:  So you are saying that the additional

23    insurance that he had to write and the -- I am not sure what --

24          MR. SANDERS:  Increased bank fees.

25          THE COURT:  I am not sure what that means or what that

16GUJARC

1    is.

2              MR. SANDERS:  A higher interest rate on the facility

3    that ultimately closed than the facility that was supposed to

4    close.

5              THE COURT:  It was in fact a higher interest rate?

6              MR. SANDERS:  A higher interest rate and additional

7    fees.

8              THE COURT:  Mr. Jarecki, did he pay those?

9              MR. SANDERS:  He provided additional funds to the

10   company so that the company could make those payments.

11             THE COURT:  But he didn't have to do that.

12             MR. SANDERS:  Yes, he did.

13             THE COURT:  No.  He had no legal obligation to do

14   that.

15             MR. SANDERS:  He could have let the movie fall apart.

16             THE COURT:  That obligation was not his personal

17   obligation, right?

18             MR. SANDERS:  It wasn't an obligation at all, it was a

19   choice either to incur the additional expense --

20             THE COURT:  But he didn't incur the expense.  It was a

21   choice made by the company.

22             MR. SANDERS:  Mr. Jarecki is the company.

23             THE COURT:  That is the opposite of the argument that

24   I get when you are here representing a company and you are

25   telling me that the individual is not the person you should

16GUJARC

```
 1     sue.

 2              So to make sure I understand the argument, you are

 3     saying that the tort that they committed was in California

 4     claiming that they had an interest in the copyright and that

 5     the foreseeable damage that that caused to the plaintiff in

 6     this case is that it made him personally have to incur certain

 7     financial obligations?

 8              MR. SANDERS:  That's correct.  And I think the other

 9     foreseeable --

10              THE COURT:  But he didn't have to incur those.  They

11     didn't make him -- he didn't have to do anything.  It is the

12     company that did it.

13              MR. SANDERS:  Well, if he didn't do that, if he didn't

14     finance his company --

15              THE COURT:  Then the company would have gone under.

16              MR. SANDERS:  Then the company would have gone under

17     and the movie would have blown up.

18              THE COURT:  And the company would have had a cause of

19     action.  But he didn't have a cause of action, did he?  He

20     doesn't have a cause of action based upon what the company

21     lost, does he?

22              Is he the copyright owner?

23              MR. SANDERS:  Yes, he is.

24              THE COURT:  Personally?

25              MR. SANDERS:  Yes, he is.
```

16GUJARC

1          THE COURT:  As opposed to the company?

2          MR. SANDERS:  There's a license to the company.  Mr.

3     Jarecki is the owner of the copyright.

4          THE COURT:  So he is the copyright owner and that they

5     should have known that by claiming they had an interest in the

6     copyright, that they would have caused him damages personally

7     and that the damages that they should have understood that it

8     was going to cause him is that the company itself would have to

9     buy greater insurance and have to refinance?  Those are the

10     natural, foreseeable consequences of their claiming that they

11     had an interest in the copyright, and it was a natural

12     foreseeable consequence that those damages were going to happen

13     immediately?

14          MR. SANDERS:  Yes.  I think the expected consequence

15     was that the movie would collapse.

16          THE COURT:  Why is it damages to him in New York as

17     opposed to California?  How much time did he spend in New York

18     as opposed to California?

19          MR. SANDERS:  This year, far more time than in

20     California.

21          THE COURT:  During that period of time when you claim

22     they committed a tort?

23          MR. SANDERS:  He was exclusively in New York.  The

24     records submitted in the opposition declaration reflect that

25     Mr. Jarecki was continuously in New York from December of 2010

16GUJARC

1     straight through the production of the motion picture.

2              THE COURT:  But December 2010 through the motion

3     picture is not the operable time.

4              MR. SANDERS:  We are talking right now about March of

5     2011, Mr. Jarecki was in New York.

6              THE COURT:  Why is March of 2011 the operative date

7     with regard to them violating your copyright?

8              MR. SANDERS:  March 1, 2011, Mr. Ohoven sends an

9     e-mail to Mr. Jarecki, knowing full well that he is in New York

10    preparing to produce the picture that says, at this point you

11    leave me no choice but to make a formal claim against you and

12    the project to protect my rights.

13             Three days later, you have Mr. Mann's' letter to Ms.

14    Lichter asserting claims to copyright, knowing full well that

15    Mr. Jarecki and the production are proceeding in New York, and

16    there is correspondence between Ms. Lichter and Mr. Sachs, also

17    in March of 2011.

18             THE COURT:  But you are not claiming that the

19    communication that you are relying upon that you characterize

20    as the tort was a communication to bind Mr. Ohoven or his

21    attorneys to anyone other than to Mr. Jarecki and his

22    attorneys?

23             MR. SANDERS:  Absolutely.  And coupled with the phone

24    calls from both Travis Mann and Andrew Mann to Greg Trattner on

25    finances --

16GUJARC

| 1 | THE COURT:  Who is Greg Trattner and what does he have |

        THE COURT:  Who is Greg Trattner and what does he have
to do with the bank financing and insurance?

        MR. SANDERS:  Mr. Trattner is a senior vice president
of Film Finances Inc.  Film Finances is referred to as FFI in
our papers and provides completion bonds for motion pictures.
What a completion bond does is, it guarantees to the bank that
the picture will be produced on time, on budget and delivered
to distributors.  Film Finances says, we are not touching this
because of the Infinity claim.  Everything collapses.

        THE COURT:  So what does Film Finances do in response
to that communication?

        MR. SANDERS:  What Film Finances said is, we are happy
to provide a completion bond as long as it excludes claims by
Infinity and Mr. Ohoven, which is what compelled Mr. Jarecki to
seek an insurance policy from Lloyd's against those claims
because the bank said, you have to make us whole.  You have to
make us satisfied that if there is an Ohoven or Infinity claim,
that we have some cover.

        THE COURT:  You are saying that delayed the financing
because you hadn't had time to go get the bond, and that time
that you used to go get the bond, in that period of time, the
interest rate went up?

        MR. SANDERS:  Yes.  The bank required, because this
was now a higher risk facility, an increased interest rate,
additional fees.  And believe me, I know that we are going to

16GUJARC

1   get a bill for every minute that the bank's lawyers, the

2   distributor's lawyer and Film Finances' lawyers spent

3   understanding what was going on here before they were

4   comfortable closing.

5        THE COURT:  That's not the nature of the complaint you

6   make here.  The nature of the complaint that you filed here is

7   not some sort of willful false activity that you claim that

8   they were engaged in that is the subject of this dispute.  The

9   subject of your dispute is irrelevant to any damages or any

10  tort.  You just want in this case, this Court to determine that

11  you in fact are the copyright owner to the exclusion of them or

12  anyone else.  That has nothing to do with a tort.

13       MR. SANDERS:  Well, it does because the natural

14  consequence of not determining that Mr. Jarecki is the sole

15  copyright holder or all of these damages that result from a

16  cloud on title.  A cloud on title prevents Mr. Jarecki from

17  delivering the film, paying back the loan facility, precludes

18  Mr. Jarecki from delivering to distributors, precludes Mr.

19  Jarecki from seeking distributors for territories that have not

20  barred the film yet.

21       THE COURT:  So you say that the fact that they made

22  this claim to whom?

23       MR. SANDERS:  To Mr. Trattner, to Ms. Lichter.

24       THE COURT:  You can't claim that because they said it

25  to Ms. Lichter that that is a tort.

16GUJARC

1              MR. SANDERS:  I think you can.

2              THE COURT:  What tort is that?

3              MR. SANDERS:  I think it is slander of title.

4              THE COURT:  If they say it to your client and they say

5    it your client's attorney?  If I call you a name and it is just

6    me, how is that slander?

7              MR. SANDERS:  I agree with you, if it is just you and

8    me, but in this instance, it wasn't --

9              THE COURT:  You are saying that somehow the fact that

10   he communicated it to your client directly and he communicated

11   it to your client's lawyer adds something to the tort of

12   slander.  It does not add anything to the tort of slander.

13   They have the right to say anything to you and your client,

14   don't they?

15             MR. SANDERS:  With the expectation that my client has

16   a duty to disclose it to third parties, it does add quite a

17   bit.

18             THE COURT:  What duty does your client have to

19   disclose it to third parties simply because they say it to you?

20             MR. SANDERS:  Because Mr. Ohoven who had produced more

21   than 25 feature films, has generated more that $600 million to

22   motion picture finance, knows full well that a filmmaker has to

23   grant representations and warranties that there is no claim --

24             THE COURT:  That may be true, but that doesn't make it

25   slander if your client repeats it.

16GUJARC

1              MR. SANDERS:  Then let's focus on the communications

2     to Mr. Trattner which are undisputed.

3              THE COURT:  What kind of communications?

4              MR. SANDERS:  We have claims against this film.  It is

5     repeated three times throughout, presumably, between March and

6     April.

7              THE COURT:  Written or oral communications?

8              MR. SANDERS:  Oral.

9              THE COURT:  So he said that to him and, as a result of

10    that, he does what?

11             MR. SANDERS:  Mr. Trattner says, we will not bond this

12    aspect of this movie.

13             THE COURT:  Is there somewhere in these papers where I

14    can look to see that the reason he said he wasn't going to do

15    this was because of this communication?

16             MR. SANDERS:  Mr. Trattner doesn't say it, but you can

17    review Mr. Jarecki's moving declaration.

18             THE COURT:  In what way does Mr. Jarecki know this and

19    has said this?

20             MR. SANDERS:  He knows it --

21             THE COURT:  Mr. Trattner --

22             MR. SANDERS:  Because the bank says to him --

23             THE COURT:  Who says to him?

24             MR. SANDERS:  The bank.

25             THE COURT:  Who?  The bank is not a person.

16GUJARC

1      MR. SANDERS:  Representatives of Union Bank.  We don't

2   mention Alex Cho by name, but it was Alex Cho who is the senior

3   vice president.

4      THE COURT:  Says to him that the reason we are doing

5   this is because of this information that we were given --

6      MR. SANDERS:  Absolutely correct.

7      THE COURT:  That's your tort argument.  What is your

8   argument that under some other specific jurisdiction theory

9   that they have, they were engaged in activity in New York that

10  serves as a basis of your declaratory judgment action asserting

11  that you are the copyright holder?

12     MR. SANDERS:  In the March letter, Mr. Mann alleges

13  that Infinity's development activities towards the picture

14  grant them an interest in copyright.  Those development

15  activities include Mr. Turen's activities both scouring

16  locations, meeting with actors in New York --

17     THE COURT:  But that activity is irrelevant to your

18  cause of action.  That activity is totally irrelevant to your

19  cause of action.  That might be the things they want to assert

20  in terms of why they claim that they have an interest, but that

21  is not the basis of your lawsuit.

22     Your lawsuit is basically, I have a copyright.  I want

23  this Court to determine that I exclusively have this copyright

24  because somebody out there is claiming they have an interest in

25  the copyright, and I want this decided once and for all.

16GUJARC

```
 1              I understand that claim.  What has any relevance to
 2      New York for you to prove that claim or for you to even assert
 3      that claim?  What difference does it make whether or not they
 4      are basing it on something that they say happened in New York?
 5              That activity is not the activity that is the basis of
 6      your lawsuit.  The activity that is the basis of your lawsuit
 7      is, whatever interest you have in the copyright and whatever
 8      claim of interest they have in the copyright.  What is the
 9      claimed interest that they have in the copyright that has
10      anything to do with New York?
11              MR. SANDERS:  The facts on which they base their claim
12      that they have an interest in copyright are Mr. Turen's
13      discussions and communications with Mr. Jarecki about the
14      screenplay.
15              THE COURT:  Which happened --
16              MR. SANDERS:  -- in New York and California.
17              THE COURT:  I don't have any indication that they did
18      any work which is the basis of the co-authorship claim that
19      they made with regard to the copyright that happened in New
20      York.
21              MR. SANDERS:  Two responses to that, your Honor.
22              First, I think you will search this record very deeply
23      to find any activity that gives a basis for co-authorship --
24              THE COURT:  That doesn't help them or you, and you
25      have the first --
```

16GUJARC

| | |
|---|---|
| 1 | MR. SANDERS:  In which case jurisdiction is over. |
| 2 | THE COURT:  No, in which case you have no claim. |
| 3 | Maybe that is not a question of jurisdiction.  You claim that |
| 4 | there is a copyright issue.  You can't have it both ways.  You |
| 5 | cannot say there is absolutely no basis for co-authorship, no |
| 6 | activity that constitutes co-authorship and have them claim |
| 7 | that the basis for co-authorship is the activity that went on |
| 8 | in California, and then you try to say to me you have some |
| 9 | basis to hang your hat on that for jurisdiction in New York. |
| 10 | MR. SANDERS:  No.  They claim the basis for |
| 11 | co-authorship in the developmental activities of the picture, |
| 12 | not sitting down next to Mr. Jarecki and saying, here's this |
| 13 | suit -- |
| 14 | THE COURT:  No.  Absolutely not.  If that's their |
| 15 | claim, I can toss that claim pretty quickly.  That's not a |
| 16 | copyright claim. |
| 17 | MR. SANDERS:  I agree with you, your Honor.  That's |
| 18 | why we are here, but Mr. Mann's letter says, based on our |
| 19 | development activities -- and I am going to read that -- in |
| 20 | addition, to the extent that -- |
| 21 | THE COURT:  But that is not a violation of copyright. |
| 22 | That is a contract. |
| 23 | MR. SANDERS:  It is an assertion of rights in |
| 24 | copyright. |
| 25 | THE COURT:  No.  The assertion of rights in |

16GUJARC

```
 1    copyright -- and that's why I asked them if they were just
 2    going to end this case and just keep it as strictly a
 3    contractual dispute rather than a copyright --
 4              MR. SANDERS:  We welcome that.
 5              THE COURT:  The only issue with regard to whether they
 6    had a direct interest in the copyright that is different from a
 7    contractual either agreement or licensing is whether or not
 8    they are the author, right?
 9              MR. SANDERS:  I agree with you.
10              THE COURT:  There is no other legal issue.
11              MR. SANDERS:  What they state is, Infinity has an
12    ownership interest in the results and proceeds of the services
13    of Mr. Turen and others and the underlying property rights to
14    the picture, including without limitation an ownership interest
15    in the screenplay.
16              THE COURT:  But the ownership interest in the
17    screenplay has nothing to do with a copyright.
18              MR. SANDERS:  How so?
19              THE COURT:  You could give them an ownership interest
20    in the screenplay without them having a copyright.
21              MR. SANDERS:  I disagree.
22              THE COURT:  You cannot say, I will keep the copyright
23    but I will give you a 20 percent ownership in the screenplay
24    and its proceeds?
25              MR. SANDERS:  That is an interest in copyright.
```

16GUJARC

1          THE COURT:  You don't have to transfer interest in the

2     copyright.

3          MR. SANDERS:  Absolutely you do.  An ownership

4     interest in copyright would have to be transferred by a written

5     exclusive license --

6          THE COURT:  That doesn't say ownership interest in the

7     copyright.

8          MR. SANDERS:  It says in screenplay --

9          THE COURT:  In the screenplay --

10          MR. SANDERS:  Unless they were talking about the

11     physical paper that the screenplay was written on, I don't know

12     what other interest they could be referring to.

13          THE COURT:  That's a contractual issue.  That is all

14     of the claims that they make in the California case.  None of

15     those are copyright claims.

16          MR. SANDERS:  I agree with you that their only

17     claims --

18          THE COURT:  You don't claim that that is a copyright

19     claim, do you?

20          MR. SANDERS:  Absolutely.

21          THE COURT:  You think that is a basis for someone to

22     legally allege that they have an interest in the copyright, to

23     simply say, I did work on it so, therefore, I have an interest

24     in the screenplay?

25          MR. SANDERS:  That's the essence of this case, your

16GUJARC

1    Honor.

2         THE COURT:  You think that is a legal basis and that

3    if they proved that -- that they could validly prove that they

4    independently have an interest in the copyright as opposed to

5    some interest that was granted to them or some

6    quasi-contractual interest that they could possibly have?

7         MR. SANDERS:  I do not think that that is a winning

8    case.

9         THE COURT:  It is not even a viable case.

10        MR. SANDERS:  I know, but that is exactly what they

11   are alleging in Mr. Mann's letter.

12        THE COURT:  But that is not what you are alleging in

13   your complaint.  You are alleging in your complaint that you

14   want a declaration that you are the sole owner of the

15   copyright, that the copyright that is registered to you is

16   properly registered to you as its sole owner.

17        Their only claim that is even a viable claim, other

18   than some contractual or semi-contractual right is no, I wrote

19   it, they didn't write it, or I wrote it with them or we both

20   came up with this.  Those are the copyright claims.

21        MR. SANDERS:  That is what Mr. Mann is alleging.  He

22   is saying --

23        THE COURT:  That part I understand.

24        MR. SANDERS:  He said Mr. Turen did, as a work made

25   for hire, and you heard Mr. Ortego say he was an independent

16GUJARC

1    contractor.

2              THE COURT:  But he didn't do that in New York.

3              MR. SANDERS:  He did it in New York and California.

4              THE COURT:  No, he didn't do it in New York.

5         What allegations have they made or what allegations do

6    you make that gives you a basis to assert that the writing of

7    this piece happened, that they say that they were involved in

8    happened in New York.

9              MR. SANDERS:  Mr. Turen's deposition.

10             THE COURT:  He says it happened in New York?  He wrote

11   it, co-authored it in New York?

12             MR. SANDERS:  He says he provided comments to Mr.

13   Jarecki in New York.

14        What the defendants are saying is that Mr. Turen's

15   comments to Mr. Jarecki:  A)  Are presumably independently

16   copyrightable or they are work made for hire and they give them

17   an ownership interest in the screenplay.

18        Granted, your Honor, we are agreement with the

19   defendants that jurisdiction is proper in California and, where

20   we disagree is that it is also proper in New York.

21             THE COURT:  You have a significant burden here because

22   there is absolutely no official business activity between the

23   plaintiff and the defendant that physically occurred in New

24   York where the two of them were in New York working.

25             MR. SANDERS:  Other than Mr. Turen and Mr. Jarecki,

16GUJARC

1     no, but Mr. Turen and Mr. Jarecki were together in New York.

2     Mr. Jarecki spent most of 2000 --

3            THE COURT:  What is it about what happened in New York

4     that is relevant to a determination that you are the

5     copyrighter?

6            MR. SANDERS:  The screenplay was written in New York.

7            THE COURT:  What difference does it make in terms of

8     what you want in terms of declaratory relief?  What difference

9     does it make that your client wrote the screenplay in New York?

10          MR. SANDERS:  That the defendant's representative

11    provided comments on that screenplay to my client in New

12    York --

13          THE COURT:  So you are saying that the substantial

14    contact by the named defendants that gives you a basis for

15    asserting personal jurisdiction over them where they are not

16    otherwise present in New York is because Mr. Turen claims that

17    he gave some suggestions to your client while Mr. Turen and

18    your client were in New York, and those suggestions were

19    incorporated into his writing --

20          MR. SANDERS:  That is the dispute right there.

21          THE COURT:  I am trying to understand what you say is

22    the basis for jurisdiction.

23          MR. SANDERS:  I think you have to look at what the

24    defendants' claim is the basis for ownership of the screenplay,

25    which is the provision of comments by Mr. Turen and others --

16GUJARC

```
 1  some of which happened in New York, some of which happened in

 2  California.

 3              THE COURT:  What is the extent of the comments that

 4  you are relying upon that happened in New York that --

 5              MR. SANDERS:  Demonstrably, there is more in

 6  California.

 7              THE COURT:  You have to give me some significant

 8  contacts.  You are trying to have me base this on this

 9  happening one time, ten times --

10              MR. SANDERS:  There is only one instance where Mr.

11  Turen talks about commenting on the screenplay in New York to

12  Mr. Jarecki.

13              THE COURT:  One time.

14              So you are not relying on any other contributions to

15  writing the screenplay for the basis of specific jurisdiction

16  other than this one time when Mr. Turen was in New York and

17  said he gave a suggestion to Mr. Jarecki?

18              MR. SANDERS:  No.  What we are relying on -- and I go

19  back to what I call defendants' incorrect assertions -- it is

20  not just Mr. Turen's written comments but the development

21  activities for the picture --

22              THE COURT:  They cut it in California.

23              MR. SANDERS:  No, in New York and California.

24              The development activities are setting the picture up,

25  choosing locations --
```

16GUJARC

1            THE COURT:  That has nothing to do with the copyright.

2            MR. SANDERS:  I agree with you, your Honor.  The

3     defendants don't take that position.

4            THE COURT:  It doesn't matter what position they take.

5     You brought this lawsuit.  I am trying to figure out what is

6     determinative of this lawsuit.  You acknowledge that that is

7     not determinative of this lawsuit.  It is totally irrelevant to

8     this lawsuit, and it is not even a viable position for them to

9     come in this court and allege as a defense your claim that you

10    own the copyright.

11            MR. SANDERS:  But that is the basis upon which they

12    allege an ownership interest in the copyright.

13            THE COURT:  That they did what?

14            MR. SANDERS:  That on pages 7, 8 and 9, the opposition

15    to the motion to dismiss, we lay out the development activities

16    the defendant is basing its interest in copyright on.  We don't

17    think those development activities rise to the level of

18    copyright.  They do.  That's the dispute right here.

19            THE COURT:  I don't know of any case law at all that

20    would support a position that, because you attempted to develop

21    a manuscript into a book or a screenplay into a movie, I don't

22    know of any case law that says that is any colorable argument

23    and that that constitutes a right in the copyright.

24            MR. SANDERS:  We agree wholeheartedly.

25            THE COURT:  But you can't rely on that for

16GUJARC

1    jurisdiction.

2              MR. SANDERS:  But they are saying that those

3    activities give them a copyright interest, and they have

4    communicated to us --

5              THE COURT:  But I am asking you, what activity do you

6    claim that your claim arises out of.  That's the analysis.  It

7    doesn't have anything to do with what they claim.  The analysis

8    is that you have hauled them into court in New York.  I have

9    asked you, what is the basis on which you say that you should

10   be in New York because they were engaged in activity which

11   makes the situs of your dispute New York and engaged in New

12   York activity that you claim creates the basis for your

13   lawsuit?  What is their activity that you claim creates the

14   basis for your lawsuit?

15             MR. SANDERS:  Their activity that we claim is the

16   basis for a lawsuit is the assertion of an interest in this

17   copyright.

18             THE COURT:  That happened in California.

19             MR. SANDERS:  Upon which they base development

20   activities.

21             THE COURT:  It doesn't matter what they base it on.

22   They could base it on air, if they want to.  But the activity

23   that you say creates the cause of action that you brought here

24   is their assertion in California that they own the copyright?

25             MR. SANDERS:  That's correct.

16GUJARC

|   |   |
|---|---|
| 1 | THE COURT:  You don't even claim that the lawyer or -- |
| 2 | you said Mann and someone else, they made comments to someone. |
| 3 | MR. SANDERS:  To Mr. Trattner. |
| 4 | THE COURT:  Who is in California.  So everybody they |
| 5 | made comments to that you are aware of that you base your |
| 6 | lawsuit on are in California, and all the comments that you |
| 7 | base your lawsuit on that gives you a basis to raise this |
| 8 | declaratory judgment claim, all of that activity happened in |
| 9 | California? |
| 10 | MR. SANDERS:  And comments to Mr. Jarecki.  They were |
| 11 | in California.  Mr. Jarecki was in New York.  There's the March |
| 12 | 1 e-mail from Mr. Ohoven to Mr. Jarecki. |
| 13 | THE COURT:  What is the basis? |
| 14 | MR. SANDERS:  To make a formal claim against you and |
| 15 | the project.  There were numerous phone calls in December. |
| 16 | THE COURT:  What is it about that e-mail that you say |
| 17 | creates a cause of action? |
| 18 | MR. SANDERS:  "I have no choice but to make a formal |
| 19 | claim against you and the project." |
| 20 | THE COURT:  You think that that creates a cause of |
| 21 | action? |
| 22 | MR. SANDERS:  I think it is an assertion, coupled with |
| 23 | the March letter, clearly asserting a claim in copyright, this |
| 24 | is what Mr. Ohoven sent to Mr. Jarecki. |
| 25 | THE COURT:  I understand that. |

16GUJARC

```
1          Anything else on that argument that you want to be

2     heard on?

3          In your preliminary injunction, you would like me to

4     issue a preliminary injunction to maintain what status quo?

5          MR. SANDERS:  Maintain the status quo that the

6     plaintiff has ownership in the copyright.

7          THE COURT:  But that is the nature of the dispute.

8     Isn't that the end of this case or the beginning of this

9     case -- I can't make that determination at this point, can I?

10         MR. SANDERS:  And to enjoin the defendants from

11    seeking to exploit the picture.

12         THE COURT:  Enjoin them from doing what?

13         MR. SANDERS:  Seeking to enter into licensing

14    agreements, seeking to --

15         THE COURT:  On what basis do I have to conclude that

16    there is any imminent danger of that happening?

17         MR. SANDERS:  There is imminent danger that they will

18    interfere with our distributor.

19         THE COURT:  How?

20         MR. SANDERS:  By asserting claims to copyright.

21         THE COURT:  Is there any evidence that they have done

22    anything like that up to this point?

23         MR. SANDERS:  Sure.  The communication with

24    Mr. Trattner.

25         THE COURT:  The communications with Mr. Trattner did
```

1     not say you can't market this film.

2              MR. SANDERS:  It says we have an interest in

3     copyright.

4              THE COURT:  Do you have any basis to believe that they

5     have done anything to interfere with your production of this

6     film or intend to do something to interfere with the production

7     of this film other than to claim that they have a copyright

8     interest in this film?

9              MR. SANDERS:  They are claiming a copyright interest

10    in this film inherently.

11             THE COURT:  I understand that argument, but is there

12    anything else?

13             MR. SANDERS:  No, there is not.

14             THE COURT:  So you just want me to enjoin them from

15    claiming they have a copyright interest until you prove they

16    don't have a copyright?

17             MR. SANDERS:  We want you to enjoin them from taking

18    any steps to interfere.

19             THE COURT:  What steps?  I cannot give you an

20    injunction except to prevent them from doing something that

21    they were doing or prevent them from doing something that you

22    think that there is some evidence that they are imminently

23    going to do.

24             MR. SANDERS:  Let me respond with two points.

25             First, I think that the communications with Mr.

16GUJARC

1  Trattner and to Ms. Lichter.

2              THE COURT:  Say that again.

3              MR. SANDERS:  The communications to Ms. Lichter and

4  Mr. Jarecki, knowing full well --

5              THE COURT:  So you don't want them to talk to

6  Mr. Jarecki or Ms. Lichter any further, is that basically it?

7              MR. SANDERS:  I don't care who they talk to or who

8  they sue --

9              THE COURT:  You have to articulate for me what

10  injunction you want.  What do you want me to order them not to

11  do?

12              MR. SANDERS:  To order them to not interfere with

13  plaintiff's exhibition of the film.

14              THE COURT:  How?  In what way do you have in your mind

15  that it has happened or it is getting ready to happen that you

16  want me to specifically tell them --

17              MR. SANDERS:  I understand your Honor's discomfort.

18              THE COURT:  I don't have any discomfort.  That's the

19  way I issue injunctions.  I don't say, don't do anything to

20  hurt the other side.

21              MR. SANDERS:  We don't want them communicating and

22  claiming that they have a copyright interest in this film.

23              THE COURT:  And you think I have the authority to say

24  to them that they can't say publicly, consistent with the

25  lawsuit that they filed, that they think they have an

16GUJARC

1    interest --

2            MR. SANDERS:  They have not filed a lawsuit saying

3    they have an interest in copyright.  They filed a lawsuit

4    saying they are entitled to monies because we breached a

5    contract.

6            THE COURT:  Have they answered in this case?

7            MR. SANDERS:  No, they have not.

8            Let me respond.

9            First, I think that you can enjoin them from

10   attempting to exploit the film.

11           THE COURT:  In what way do you have evidence that they

12   intend to exploit the film to do you irreparable injury?

13           MR. SANDERS:  The other is, we have their past conduct

14   and we believe they will take any steps that they can.

15           THE COURT:  Like what?

16           MR. SANDERS:  Like contacting Mr. Trattner --

17           THE COURT:  If they contact Mr. Trattner, how is that

18   going to stop the film from being made?

19           MR. SANDERS:  It makes it impossible for Mr. Jarecki:

20   A) to deliver to existing licensees because he would be in

21   breach of the representation and warranty that he has clean

22   title.

23           THE COURT:  Your client cannot claim he has clean

24   title.  You have a problem with the title.  That is a reality.

25   Until that cloud is lifted, until you prove your case in a

16GUJARC

1    court of law, there is a cloud over the title.  I cannot make

2    the clouds go away.  There is nothing that I ordered them to

3    do.  All anyone has to do is pick up the paper and walk into

4    the court in California and New York see that there is a cloud

5    over your title.

6             MR. SANDERS:  I don't think anyone is going to pick up

7    the document in California and say, hey, Mr. Jarecki and

8    Infinity have a contractual or a tort dispute that is not going

9    to interfere with our ability to release this film.

10            THE COURT:  As long as you have a declaratory judgment

11   outstanding --

12            MR. SANDERS:  Fair enough --

13            THE COURT:  -- and then a lawsuit to sue them so that

14   you can get a judicial determination that they have no interest

15   and you do, there is a cloud over the title.

16            MR. SANDERS:  Your Honor, I reluctantly agree, and

17   that's precisely why we suggested that you exercise your

18   discretion to convert this motion to one for summary judgment.

19            There are really only two facts at issue here, as you

20   have noted.  Was there a contractual transfer of copyright

21   interest under Section 204 of the Copyright Act?  Was there an

22   intent to create a joint work?

23            We would submit that there is no discovery that needs

24   to happen on that point.  If it is helpful to your Honor and to

25   the defendants, give them 30 days to produce evidence that

1    there was a contractual transfer or that there was an intent

2    that someone other than Mr. Jarecki be the author of the film,

3    then I think we can get to the same place.

4            THE COURT:  Well, the contractual transfer, is that

5    really my issue or the California issue?

6            MR. SANDERS:  It arises under Section 204 of the

7    Copyright Act, either there is a writing signed by the

8    copyright owner or there is not.

9            What they said in the California case, Mr. Jarecki

10   made an oral promise that he would sign a transfer, and maybe

11   they have a reliance argument, but there is no copyright

12   interest that arises from it.

13           THE COURT:  Let me see if I can wind it up.

14           Let me hear from Mr. Ortego.

15           MR. ORTEGO:  Judge, I just have two things that I

16   wanted to raise with regard to the motion.

17           First, on the motion for summary judgment, we received

18   36 hours ago in a reply brief, a suggestion for a summary

19   judgment motion which I respectfully ask the Court not to

20   entertain in any way.  It is a reply brief.  You gave them an

21   extra 10 pages and it became a motion for summary judgment.

22           Secondly, Judge, I did misspeak, I think, to the Court

23   about Mr. Turen.  I think we both had a discussion with regard

24   to him being president.  He must have had authority to bind the

25   company and he wasn't, he had to be an employee.

16GUJARC

1          THE COURT:  That's usually what president means.

2          MR. ORTEGO:  That's that I thought so too, Judge, and

3    I agree with you, but I have a declaration from Kevin Turen

4    that was submitted by Mr. Jarecki in response or in support of

5    his preliminary injunction motion.  He states in paragraph 7 of

6    that declaration, "While I provided significant services for

7    Infinity during the Turen/Infinity period, at no time was I an

8    employee of Infinity, any of its subsidiaries or affiliates or

9    any entity controlled by Michael Ohoven."

10         THE COURT:  But he was an officer of the company?

11         MR. ORTEGO:  Judge, I don't dispute that, but he

12   submits an affidavit.

13         THE COURT:  I am just trying to figure out, are you

14   saying that that is any distinction that is somehow in your

15   favor in terms of whether he was an employee?  He is the

16   president of the company.  He is an officer of the company.  He

17   could have worked for one dollar, a million dollars or no

18   dollars.  He could have been gratuitously the president of the

19   company, but the president of the company, if this is a valid

20   legitimate company, has the authority to act on behalf of the

21   company.

22         MR. ORTEGO:  I guess what I am trying to say, Judge,

23   from the perspective of the jurisdiction, it doesn't seem clear

24   to me now when Mr. Turen was having his conversations or

25   discussions with Mr. Jarecki in New York, whether or not he was

16GUJARC

1   acting on behalf of the company and for it to create

2   jurisdiction according to this.  I just throw that out, Judge.

3   I don't know where it is.  I didn't submit the declaration, but

4   it is different.

5          The only other thing about this, Mr. Trattner is a

6   California resident.  First, they alleged threats, but I looked

7   at his declaration.  There seems to be no threat, simply a

8   claim, and I don't think that the declaration said that we

9   alleged a copyright claim, but just for the record, I just

10  wanted the declaration there.  That was submitted also on

11  behalf of plaintiffs.

12         And that's all that I needed to add at this point,

13  your Honor.  You have our briefs and papers.

14         THE COURT:  I am going to go ahead and rule.

15         I find that the contacts that were relied upon are not

16  significant enough to assert personal jurisdiction over either

17  the company in California or the individuals in California.

18         It has been acknowledged that neither Mr. Ohoven or

19  Mr. Jarecki ever met together in New York for the purposes of

20  advancing this film.

21         There is no direct connection between Mr. Ohoven and

22  New York.  His only reliance in this case is upon the e-mail

23  communications which, in and of itself, don't establish a basis

24  for jurisdiction, and the telephone conversations with the

25  person on the cell phone.

16GUJARC

      Quite frankly, even if one were to assume that
Mr. Ohoven was aware that Mr. Jarecki was in New York at the
time that he sent the e-mails or at the time he spoke to him on
the phone, even that, in and of itself, is not significant
enough contact to haul into New York a defendant that has never
set foot in New York and that one would, with due process,
reasonably expect that because we spoke to them on the phone in
New York or e-mailed them and they were in New York either on a
part-time basis or for some continuous limited period of time,
that that itself would create significant enough contacts to
base jurisdiction on.

      I think Mr. Turen's activity itself, there is nothing
that the plaintiff relies upon that in and of itself would
constitute sufficient activity to haul a defendant into court.

      Everyone here is a California person, and the
negotiations and activity significantly and primarily are
California negotiations and activities.  Other than the periods
of time that Mr. Jarecki was in New York and the anticipated
activity that would be related to making the film, they might
in the future take place in New York, in some preliminary
activity in anticipation of making a motive, there is no
significant contacts out of which this lawsuit arises.

      Beyond that, I think that even if the contacts were
more substantial, the real question is whether or not this
lawsuit arises out of those contacts.

16GUJARC

          Nothing that happened in New York created this lawsuit
or contributed to the circumstances under which the plaintiff
brought its lawsuit.  The lawsuit is simply a declaratory
judgment that the California company and the California
individual who has asserted in California that they own an
interest in the copyright, that the plaintiff seeks purely a
declaration that those assertions are invalid and have no legal
basis for them to make such a claim.  That being the very, very
limited issue that this case addresses, I cannot find, dealing
with New York's long arm statute, that that is the set of
circumstances that one could say that this lawsuit arises out
of activity that occurred in New York and that the defendant
could possibly anticipate that a lawsuit in New York would
arise out of the activity that the plaintiff is asserting puts
a cloud over their interests in the copyright that they wish
they had lifted, given the declaratory judgment in this case.

          Beyond that, even the theory of a tort being committed
outside of New York causes injury in New York, this lawsuit,
first of all, is not a lawsuit about damages that resulted in
New York from a tort.  That is not what this lawsuit is about.

          This lawsuit is strictly a declaratory judgment
lawsuit as to who has an interest in the copyright.  That being
said, there is no valid analysis that could be applied here
that this lawsuit is to vindicate a tort that occurred, that
was committed by the defendants in this case and caused injury

16GUJARC

1   to the plaintiff in New York.

2          That is not what this lawsuit is about.  That's the

3   analysis that the statute requires.  That is the nature of this

4   lawsuit.  The nature of this lawsuit relates to a tort

5   committed by a defendant outside of New York that in fact

6   caused injury to the plaintiff in New York.  It is not this

7   lawsuit.  This lawsuit could have been brought anywhere that

8   there is otherwise personal jurisdiction over the defendants,

9   clearly in California.

10          As I say, even if I could accept the analysis the

11   defendant committed a tort in California by claiming they had

12   an interest in the copyright and that assertion caused injury

13   to the defendant in New York, it is still unrelated to a

14   declaratory judgment action as to who in fact does own the

15   copyright.

16          The analysis, no relevant testimony is determinative

17   with regard to a tort or with regard to tortious activity that

18   caused injury to the plaintiffs in this case.  No analysis of

19   any such evidence is even relevant to a determination of who

20   owns the copyright.

21          The tort itself has been characterized as a statement

22   that they owned the copyright.  A statement that they owned the

23   copyright, whether it is a tort or not a tort, whether it

24   caused the injury or didn't cause injury to the plaintiff when

25   the statement is made is totally irrelevant to who in fact owns

16GUJARC

the copyright.  If that's the issue in this case, that is the

only issue in this case, and that would be the issue in this

case whether or not the defendants had made such a public

statement, even if such a public statement were to be

characterized as not just false but defamatory.

In this case, it doesn't matter whether they made such

a statement or didn't make such a statement; that is only what

precipitated the plaintiff bringing this lawsuit and increased

their fear that if they did not make clear who owned the

copyright, that they might suffer damages in future.  So

whether or not the defendant whispered that in the plaintiff's

ear or said it to their lawyer or e-mailed it to them, it is

totally irrelevant to whether in fact it is true.

The only connection with New York with regard to that

particular issue is solely the plaintiff's residence in New

York, to the extent the plaintiff has a residence in New York.

At this point, the record only indicates that he has a joint

residence of New York and California and that there's no

evidence that New York is the defendant's domicile.

And there is no evidence that the primary activity

between the parties -- if there is any evidence -- well, there

is clearly no evidence that the primary activity between the

parties, or in any way related to who owns the copyright and

whether or not the plaintiff has exclusive right to its

registered copyright, that the primary activity is relevant to

16GUJARC

that activity that occurred in New York.

So I think there is not a sufficient basis to try to assert jurisdiction over a California corporation that does not do business no New York, over a California individual who is not a resident of New York, and there is no indication that they have any presence in New York -- the individual has not even been to New York -- and that the company has any business activity in New York that is either related to or unrelated to the question of whether or not a copyright in fact exists exclusively in the plaintiff's ownership.

So I think that the contacts are insufficient for asserting personal jurisdiction on either one of these defendants.  I think that not only the contacts are insufficient, but even if they were more substantial, this lawsuit for declaratory judgment as to who owned the copyright is not a lawsuit that arises out of some relevant activity in New York.  This is separate from the contractual dispute in California and separate from any licensing agreement or any agreement of the parties that the defendant would have some interest.

Even with regard to some independent assertion that they contributed to the screenplay, even if one were to credit that activity as being somehow legally significant to merit a determination that they -- or the defendants in addition to the plaintiff -- would have some interest in the copyright, the

16GUJARC

1   activity that would serve as the basis for such a legal

2   assertion is not primarily significant New York activity.

3          At this point I am willing to transfer the case -- if

4   you want the case transferred rather than dismissed -- to the

5   Central District of California, which seems to be the place

6   that is appropriate for both venue and jurisdiction purposes.

7          And even using at least a forum non conveniens venue

8   analysis with regard to where this case is appropriate to be

9   brought, it is much more significant and the nature of the

10  activity and the witnesses all primarily have some connection

11  with California and the Central District of California.  And as

12  to venue, the Central District of California would be more

13  appropriate than the Southern District of New York, given the

14  nature of primarily the contact, the California contacts, the

15  California witnesses and the nature of the activity among the

16  parties to the activity and for the parties to rely upon to

17  establish their right to the copyright itself.  It is a very

18  limited issue.  And, in fact, all of the other issues that were

19  related to that, other than the state court defamation issue in

20  the state court, can make its own determination as to whether

21  that is a appropriate case on jurisdiction or on merit.

22         This case solely puts at issue who is the registered

23  legal copyright owner and has no significant connection with

24  any activity in New York that is going to be determinative of

25  that issue or of this lawsuit -- the declaratory judgment on

16GUJARC

1    the copyright ownership issue, that it arises out of

2    substantial, significant or relevant New York activity.

3            So based on those findings, I determine that there is

4    not a sufficient basis to assert jurisdiction over the

5    defendants in this case in New York.  And, as I say, rather

6    than dismiss the case, in the alternative, I am prepared to

7    transfer this case, and if the plaintiff would prefer me to

8    transfer, I will transfer this case to the Central District of

9    California as opposed to dismissing this case so that the

10   parties can attempt to resolve their outstanding disputes in a

11   forum that is appropriate.  They can resolve this and the

12   related cases.

13           Mr. Sanders, do you have a position?

14           MR. SANDERS:  We prefer transfer to the Central

15   District of California.

16           THE COURT:  I will issue an order for transfer, and

17   that will be the Court's decision, with the plaintiff

18   preserving its right for appeal purposes to object or seek

19   reversal of the decision to transfer to the Central District of

20   California based on lack of personal jurisdiction over the

21   defendants -- I can't call it a copyright infringement case,

22   but I call it a copyright claim case.  If this were a copyright

23   infringement case, I think it is appropriate to send this case

24   back to California, and you can determine whether in California

25   you want to resolve all of the issues in one forum or have

16GUJARC

1   several different forums.

2           That is my determination.

3           I will issue an order today transferring this case for

4   lack of personal jurisdiction over the defendants to the

5   Central District of California.

6           MR. SANDERS:  Thank you, your Honor.

7

8                           o   0   o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25